UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

SHERYL P. SPROUSE, EXECUTOR OF
THE ESTATE OF DAVID MARSHALL
SPROUSE, DECEASED,

                                    Plaintiff,

           v.                                         Action No. 3:08–CV–491

AMERICAN TIRE DISTRIBUTORS, INC, *et
al.*,

                                    Defendant.

<u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on Defendants' Motions for Summary

Judgment (Docket Nos. 37 & 41) and Motions to Exclude Experts (Docket Nos. 39, 43,

& 45).  For the reasons stated below, Defendants' Motions for Summary Judgment

will be GRANTED, and the Motions to Exclude Experts will be DISMISSED AS

MOOT.

I. <u>BACKGROUND</u>

A. <u>Factual History</u>

In January 2003, American Tire Distributors ("ATD") sold Mr. David Sprouse

("Mr. Sprouse") a two-post, surface-mounted vehicle lift Model No. WH-10SYM (the

"Lift") manufactured by Wheeltronic, Ltd.—of which Snap-On Incorporated is the

successor in interest and files this Motion.[1]  (Am. Compl. ¶ 10; Defs.' Mem. Supp. Mot. for Summ. J. 1–2.)  ATD hired Alton Felder ("Felder") to install the Lift in Mr. Sprouse's shop.  (Am. Compl. ¶ 10–11.)

On October 26, 2007, Mr. Sprouse was operating the Lift in his shop.  (Am. Compl. ¶ 13.)  A Ford Ranger pickup truck (the "Truck") was on the Lift at the time. (Am. Compl. ¶ 14.)  At some point, as the Truck was positioned in the air by the Lift, the Truck fell off the Lift and onto Mr. Sprouse, killing him.  (Am. Compl. 14–15; Wandling Rep. Fig. 6.)  Emergency personnel and the Virginia Department of Labor and Industry arrived at the scene to document the accident and assist Mr. Sprouse. (Defs.' Mem. 3.)

<u>The Lift</u>

The Lift is a two-post, hydraulic, surface-mounted lift, composed of two towers positioned about ten feet apart.  (Am. Compl. 12; Wandling Rep. 2; Barrett Rep. 3.) Each column has four telescopic lift arms, connected to lift pads which work to raise an automobile using hydraulic pumps.  (Wandling Rep. 2; Barrett Rep. 3.)  To use the Lift, the vehicle is positioned so that the vehicle's center of gravity is between the two towers.  (Wandling Rep. 2.)  The arms are then pivoted on a horizontal plane and positioned under the vehicle's "lift points."  (Wandling Rep. 2; Barrett Rep. 3.)  These lift points are specific to each vehicle and are specified by the manufacturer. (Wandling Rep. 2; Barrett Rep. 3.)  Generally, the lift points are behind the two front

---

[1]  Snap-On and Wheeltronic collectively will be referred to as "Snap-On Defendants".

wheels and in front of the two back wheels.  (Wandling Rep. Figs. 1–2.)  Each arm

may be adjusted to a length between 35.23 and 53.5 inches.  (Wandling Rep. 2.)  Arm

restraints are positioned at the pivot point of each arm, and are used to lock the

arm's position once the vehicle is lifted from the ground.  (Wandling Rep. 3; <u>see</u>

Barrett Rep. 4.)  The locking action takes place when the gear segment attached to

the arm meshes with the arm lock assembly attached to the tower.  (Wandling Rep.

3; Figs. 3–4; Barrett Rep. 4.)  As the vehicle is lifted up from the ground, the arm lock

assembly attached to the tower moves into the "down" position, which engages the

arm restraint and locks the arm in place prohibiting it from moving while the vehicle

is in the air.  (Wandling Rep. 3; Barrett Rep. 4.)  When the arm lock assembly is in the

"up" position, the gears from the tower portion and the gears from the arm are not

engaged, and the arm can move freely.  (Wandling Rep. 3.)  A spring within the arm

lock assembly controls the locking action—it is compressed while on the ground,

which pushes the gear "up," and it is expanded while in the air, which allows the

gear to slide "down."  (Wandling Rep. 3; Barrett Rep. 4.)  The photographs taken

after the accident show the arm lock assembly in the "down" position.  (Wandling

Rep. Fig. 8; Barrett Rep. 8.)

At the end of each arm is a 4 ¾ inch round rubber lift pad which acts as the

point of contact under the vehicle.  (Wandling Rep. 3.)  The lift pad may be adjusted

using adapters, as some vehicles require additional lift.  (Wandling Rep. 3; Fig. 6;

Bryan Smith Dep. 28:1–25.)  Cables are located between the two towers, which

ensures the towers lift the vehicle evenly.  (Wandling Rep. 3.)  There is a mechanical

safety on each tower which serves as a "back-up" device preventing the Lift from dropping the vehicle suddenly, which was disabled at the time of the accident by a bungee cord holding the safety handle in the "off" position.  (Id. 4, 19: Fig. 7.)

B.  Procedural History

Sheryl Sprouse ("Mrs. Sprouse" or "Plaintiff") qualified as executor of her husband's estate on November 16, 2007.  (Am. Compl. ¶ 8.)  Plaintiff brought this Complaint against ATD, Snap-On, and Wheeltronic on August 4, 2008.  Defendants moved to dismiss the Complaint for failure to adequately state claims against them on August 28, 2008.  The Court granted the Motion to Dismiss and gave Plaintiff leave to amend her complaint on October 24, 2008.  On November 3, 2008, Plaintiff filed her Amended Complaint to which ATD filed a Motion to Dismiss Count Three (negligent installation).  The Court granted ATD's Motion on January 14, 2009.  Therefore, the counts remaining in the Amended Complaint are: Count One: Design and Manufacturing Defect of the Lift, Count Two: Breach of the Duty to Warn, and Count Four: Breach of Implied Warranty of Merchantability.  Snap-On Defendants and ATD have filed Motions for Summary Judgment.

## II.  STANDARD OF REVIEW

A motion for summary judgment lies only where "there is no genuine issue as to any material fact" and where "the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The Court must view the facts and the inferences drawn therefrom in the light most favorable to the non-moving party.  Ballinger v. N.C. Agric. Extension

4

Serv., 815 F.2d 1001, 1004 (4th Cir. 1987).  While viewing the facts in such a manner, courts look to the affidavits or other specific facts to determine whether a triable issue exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Summary judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  To overcome a motion for summary judgment, the non-moving party must establish that a genuine issue of material fact actually exists.  Fed. R. Civ. P. 56(e); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-86, 586 n.11 (1986).  "Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law." Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008).  "Where no genuine issue of material fact exists," it is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  Drewitt v. Pratt, 999 F.2d 774, 778–79 (4th Cir. 1993) (internal quotation marks omitted).

The mere fact that an expert witness endorses a "wholly speculative theory of causation" will not make an issue of fact.  Stokes v. Geismar, 815 F. Supp. 904, 909 (E.D. Va. 1993); Kelley v. United States, No. 1:08CV31, 2009 WL 790078, at *10 (E.D. Va. Mar. 20, 2009).  Further, "Courts, in fact, are 'particularly wary of unfounded expert opinion when causation is the issue.'" Id. (citing In re "Agent Orange" Prod. Liab. Litig., 611 F. Supp. 1223, 1249 (E.D.N.Y. 1985)).  The Supreme Court has held that "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse

dixit of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Lastly, if there

is "too great an analytical gap between the data and the opinion proffered," the court

may choose to disregard the expert's speculative theory. Kelley, 2009 WL 790078, at

*10 (citing Gilbert v. Gulf Oil Corp., 175 F.2d 705, 709 (4th Cir. 1949)); see Oglesby v.

Gen. Motors Corp., 190 F.3d 244, 249 (4th Cir. 1999) ("We have admonished that a

plaintiff may not prevail in a products liability case by relying on the opinion of an

expert unsupported by any evidence such as test data or relevant literature in the

field.").

III.  DISCUSSION

A.  Manufacturing Defect

Under Virginia Law, a product must be "fit for the ordinary purposes for which

it is to be used," and a manufacturer may be liable for injuries resulting from a

"foreseeable misuse" of the product.[2] Hall v. Int'l Paper Co., No. 3:07CV064, 2007 WL

2965054, at *3 (E.D. Va. Oct. 9, 2007) (citing Slone v. Gen. Motors Corp., 457 S.E.2d

51, 54 (Va. 1995)). To recover for an injury sustained during a foreseeable use of a

product, a party must demonstrate that "the unreasonably dangerous condition[3]

existed when the goods left the defendant's hands," Logan v. Montgomery Ward &

---

[2] There is no disagreement that Mr. Sprouse used the Lift in a foreseeable
manner.

[3] A product can be "unreasonably dangerous" if defective in manufacturing,
"imprudently designed," or if proper and adequate warnings do not accompany the
product. Bly, 713 F.2d at 1043 (citing Matthews v. Ford Motor Co., 479 F.2d 399, 400
(4th Cir. 1973); Dreisonstok v. Volkswagenwerk, A.G., 489 F.2d 1066, 1071 (4th Cir.
1974); Spruill v. Boyle-Midway, Inc., 308 F.2d 79, 85–86 (4th Cir. 1962)).

Co., 219 S.E.2d 685, 687 (Va. 1975), and that the "product was not substantially

changed after the time of sale." Bly v. Otis Elevator Co., 713 F.2d 1040, 1043 n.2 (4th

Cir. 1983); Stokes, 815 F. Supp. at 908.   Plaintiff must also demonstrate with

"reasonable certainty" that if there is more than one possible cause of the accident,

Defendants caused the injury.  Id.; Boyle v. United Techs. Corp., 792 F.2d 413, 416

(4th Cir. 1986).  A plaintiff will not be permitted to recover where responsibility is

"conjectural," or if the "evidence does not prove that his damages were produced by

the negligence of the defendant . . . or if it is just as probable that damages were

caused by one as by the other" reason.  Stokes, 815 F. Supp. at 908 (citing Cape

Charles Flying Serv., Inc. v. Nottingham, 47 S.E.2d 540, 544 (Va. 1948)).  In examining

post-accident conditions, Plaintiff must establish that the conditions were caused by

the alleged defect, and not another reason, such as the accident itself.  Stokes, 815

F. Supp. at 910 ("While the disc appears to be flawed now, no one can tell whether

that defect existed at the time the disc was sold to Rail Tec, or whether it was the

result of improper modifications, faulty maintenance, or improper use of the saw by

plaintiff on the date of the accident.").

A plaintiff can defeat summary judgment "only if his evidence tends to

eliminate all reasonable possibilities that some other party or cause is to blame for

the accident, or if the facts are such that no other inference but the existence of a

defect . . . is reasonable."  Lemons v. Ryder Truck Rental Inc., 906 F. Supp. 328, 333

(W.D. Va. 1995) (emphasis added).  Circumstantial evidence alone can be used to

prove products liability, Wilder v. Toyota Motor Sales, U.S.A., Inc., 23 F. App'x 155,

2001 WL 1602043, at *2 (4th Cir. 2001) (unpublished), and evidence that establishes that the result is a "probability rather than a mere possibility" can demonstrate a breach of warranty.  S. States Coop. v. Dogett, 292 S.E.2d 331, 335 (Va. 1982). Generally, the question of whether a product is unreasonably dangerous is a question of fact.  Hall, 2007 WL 2965054, at *3 (citing Morgen Indus. v. Vaughan, 471 S.E.2d 489, 492 (Va. 1996)).

Snap-On Defendants argue that they are entitled to judgment as a matter of law because Plaintiff fails to prove the Lift was in a dangerous condition[4] when it left their control, nor can Plaintiff prove Snap-On Defendants caused Mr. Sprouse's injuries with "reasonable certainty."

1.  Plaintiff cannot prove there was a manufacturing defect that made the Lift unreasonably dangerous when it left Snap-On Defendants' control.

Plaintiff asserts that there was a manufacturing defect in the arm lock assembly, and such a defect was present when the Lift left Snap-On Defendants' control.  (Am. Compl. ¶¶ 17–20.)  Plaintiff's only evidence to this fact is their expert report completed by Dr. Rolin F. Barrett.  Dr. Barrett concluded that (1) the arm locking assembly suffers from a design defect because the holes provide for possible improper installation, (2) the arm lock assembly was defectively manufactured because the gear teeth could become jammed, (3) the gear on the arm was defectively designed because the bolts could loosen, (4) there were no specific torque

---

[4] The dangerous conditions in this case are manufacturing defect and/or a failure to warn.

specifications in the manuals/instructions, (5) there were no warnings that the arm lock assembly and the arm gear may not engage, and (6) the installation was defective.[5]  (Barrett Rep. 17.)  To the contrary, Defendants' expert, Dr. George Wandling, concluded that there was no manufacturing defect and that the Lift was not unreasonably dangerous when it left Defendants' control.  (Wandling Rep. 17–18.) Normally, this would present an issue of fact barring summary judgment, however, because Dr. Barrett's expert opinion amounts only to a speculative theory of causation, the Court will disregard Barrett's claims.  Thus, no material issue of fact as to the presence of a manufacturing defect exists.

### a.  Dr. Barrett's Expert Opinion

To form the foundation for his conclusions, Dr. Barrett reviewed photographs taken of the Lift, manuals and instruction documents for the Lift, the Lift in person after the accident, and later a detailed examination of the lift arm at his laboratory. Dr. Barrett also inspected the Truck involved in the accident, and interviewed Paul Sprouse, Mr. Sprouse's son.  While Dr. Barrett's inspection and investigation of the accident were appropriate steps in collecting data to make his determination, his conclusion that this was a manufacturing defect is nothing more than an unsupported leap from the evidence.

Dr. Barrett only inspected the Lift after the accident and found that the arm

---

[5]  Dr. Barrett effectively dismissed his conclusions of design defect of both the arm locking assembly or the swing arm's gear in his deposition where he stated, "I feel like this is a manufacturing defect, but not insofar as the design."  (Barrett Dep. 139:17–24.)

locking assembly did not lock, allowing the arm to pivot.  (Barrett Rep. 6.)  He also found that the gear segment connected to the arm was not secured tightly.  (Id.)  Dr. Barrett further concluded that the rod connected to the locking assembly attached to the tower was not perpendicular to the tower, but was "at a slight angle from perpendicular."  (Id. 7.)  Additionally, the rod itself was found slightly bent, which Dr. Barrett concluded was present before the accident, and further evidence of a manufacturing defect.  (Barrett Dep. 93:17–24 ("[T]he rod has weld all around it, and there's no evidence of any cracking or moving or any of that.  This was manufactured like that.").)[6]  He also found that the teeth of the mechanism attached to the tower had "scrape markings" on the lower portion of the gear, indicating that the movement of the gears was not only up and down, but also side to side.  (See id. 7.) Dr. Barrett discovered that the gear on the arm locking assembly was pushed slightly inward causing some scratching on the back of the gear piece, to which some lubricant had been added at some point.  (Id. 8.)  Dr. Barrett fails, however, to explain how any of this evidence results in a finding of manufacturing defect and was not a result of the accident (e.g. how the falling of the Truck from the Lift did not cause these circumstances).

Dr. Barrett's review of the photographs taken at the scene showed that the arm lock assembly was in the "down" position after the accident, indicating that the

---

[6] Dr. Barrett fails to include any discussion of this cracking or bending in his Rule 26 Report and beyond this conclusory statement, fails to provide any evidence backing up his assertion that the rod was bent before the accident, or that it was a result of a manufacturing defect.

arm was locked when the accident happened, but had been forced backward for some reason.  (Id.)  Notwithstanding this uncontested evidence that the gear was in the "down" position, Dr. Barrett includes an unsubstantiated claim that "some photographs made by the Hanover County Sheriff's Office suggest that the straight section with gear teeth [the portion attached to the tower] may have been elevated." (Id.)  Dr. Barrett does not provide these photographs in his report (nor any photographs for that matter), and later admits that the photographs showing the gears in the "up" position may have been taken at a later time.  Dr. Barrett then couches his admission that the gear was in the "down" position by acknowledging that it "clearly was down at some time following the accident," but raises the suspicion that the gear was likely up prior to the accident.  (Id.)  Dr. Barrett's analysis stops here, and he does not provide any additional support, beyond this statement, that the arm was <u>not</u> locked at the time of the accident.     Moreover, Dr. Barrett's conclusions were made without any mathematical or scientific measurements.  He concedes he did not do any calculations in relation to the case.  (Barrett Dep. 20:15–17.)  Specifically, he did not attempt to ascertain if the lift arms were higher on one side than the other, (Id. 67:1–20) nor did he measure the distance between the lift points used and where the lift points should have been.  (Id. 53:5–10).  Dr. Barrett's discovery that the locking assembly was welded onto the tower five degrees off from perpendicular was done by "eyeballing" it. (Id. 96: 14–20.)

Somehow from this body of evidence, Dr. Barrett makes his conclusion that "the pick-up truck fell because the right front arm of the Lift was able to pivot when a

force was exerted on the vehicle or the Lift, causing the pick-up truck to move."
(Barrett Rep. 17.)  He makes the determination, "[i]f the straight section with gear
teeth had been down and had engaged the teeth on the gear segment, then the arm
would have been locked and could not have pivoted to the position in which it was
found following the accident," but fails to explain how he made this determination, or
why this determination results in a finding of manufacturing defect.  (Id. 13.)  Further,
Dr. Barrett fails to explain how or why the arm was found in the down position when
the investigators took photographs of the scene, if his conclusion is that the arm's
lock was not engaged and allowed the arm to swing freely under the vehicle.  Dr.
Barrett does not meet the standard enumerated in Stokes, that in using the post-
accident evidence, Plaintiff must show that the condition was caused by the defect,
and not the accident itself.

Dr. Barrett provides one theory which presents some merit; that the arm lock
assembly was pushed too far back in its carriage to have contact with the gear on
the arm and this prevented the two from meshing and locking the arm.  (Id. 14.)  He
frames this theory in terms of either a defect or improper adjustment.  But Dr. Barrett
provides no evidentiary support derived from the scene or investigation that supports
these theories.  It is true there were scrapes found on the flat back of the gear in the
arm lock assembly, but this proves nothing but movement over the nearly five-year
period of time the Lift was in use.  Dr. Barrett fails to account for why these scrape
marks are conclusive evidence of a manufacturing defect.

For this reason, Dr. Barrett's expert opinion that this was a manufacturing

defect is not supported by any of the evidence presented in his report.  He fails to present any viable theory based on the evidence of the case beyond a "wholly speculative theory of causation."  For this reason, his opinion that this was a manufacturing defect will be disregarded by this Court.[7]

>    b.  <u>Dr. Wandling's Expert Opinion</u>

Defendants' expert, Dr. Wandling, concludes that the Lift was not defective, nor was it in a dangerous condition when it left Defendants' control.  Dr. Wandling's expert opinion appears credible and does not make the same mistakes as Dr. Barrett's opinion because there are no analytical gaps in Dr. Wandling's opinion.  Dr. Wandling points out that the arm lock assembly was in the "down" position after the accident, demonstrating that it was operating properly when Mr. Sprouse lifted the Truck.  (Wandling Rep. 18.)  Dr. Wandling further explains that the wear marks observed by Dr. Barrett on the back of the gears on the piece connected to the tower are not evidence of a defect, but that "the handle weldment was moving within the C-channel of the bracket weldment," indicating proper movement.  (<u>Id</u>.)  Additionally, Dr. Wandling's Report provides credible evidence supporting other causes of the accident, which Dr. Barrett never addresses in his conclusions.

---

[7]  Plaintiff submits an additional affidavit from Dr. Barrett in her responsive memo, which makes the same conclusory allegations without any evidentiary support.  (Barrett Aff. 10–11.)  The affidavit focuses on one theory, manufacturing defect, as opposed to the five theories Dr. Barrett originally proposed.  The Court will also disregard this affidavit as an attempt to cure the deficiencies in Dr. Barrett's original opinion and Report.   The Fourth Circuit has stated that a district court may disregard an affidavit if there are conflicting versions of an expert's report where the court is left to "determine which of the several conflicting versions . . . [is] correct." <u>Rohrbough v. Wyeth Laboratories, Inc.</u>, 916 F.2d 970, 976 (4th Cir. 1990).

2.  <u>Plaintiff also fails to establish with reasonable certainty that Defendants
caused Mr. Sprouse's injuries.</u>

    a.  <u>Dr. Barrett's Expert Opinion</u>

As discussed above, Dr. Barrett makes several unsubstantiated leaps from the
evidence to support his theory of manufacturing defect.  But, Dr. Barrett's opinion
fails in another way, because he fails to demonstrate causation—specifically that
such a manufacturing defect caused Mr. Sprouse's injuries.  Dr. Barrett concludes
that the manufacturing defect in the arm locking assembly caused the arm on the Lift
to remain unlocked while the Truck was in the air, and this caused the Truck to fall
and kill Mr. Sprouse.  (Am. Compl. ¶¶ 17–21.)

The law requires that Plaintiff's theory of product defect eliminate all other
reasonable possibilities of causation and show the defect <u>probably</u> caused the
accident.  Dr. Barrett fails to discuss other possible reasons for the accident, (e.g.
failure to inspect the Lift before use, failure to maintain the Lift properly, or that the
force of the Truck falling caused the arm to pivot backwards).  Dr. Barrett's sole
explanation for why the arm pivoted was that it was not locked at the time of the
accident.  (Barrett Rep. 12; Barrett Dep. 136:9–14.)  The fallacy of this statement is
that the arm not being locked does not necessarily prove that there was a defect in
the Lift causing the accident.

Dr. Barrett examined the Truck and observed "scrapes and marks" on the
underside of the vehicle, but he failed to measure any of the scrapes or attempt to
distinguish the marks in any meaningful way.  (Barrett Rep. 11, 16.)  He came to the

conclusion, "Marks on the frame of the Ford Ranger pick-up truck <u>suggest</u> that pads of the lifting device involved in the accident had been positioned approximately in [correct] positions."  (<u>Id.</u> (emphasis added))  This conclusion attempts to dissuade the Court from assuming the accident was caused by Mr. Sprouse placing the pads in the incorrect lift points under the Truck before lifting it, but again, Dr. Barrett provides no evidence supporting his theory.

Dr. Barrett also fails to account for time and use.  The Lift was installed in January 2003 and its use was without incident until October 2007.  Dr. Barrett's theories are based on a possible manufacturing defect, but he fails to explain how the Lift was used continuously and without a complaint or accident for nearly five years, if the arm was defective from the time it left Snap-On Defendants' control in 2002. (<u>See</u> Barrett Dep. 37:1–7.)[8]

b.  <u>Dr. Wandling's Expert Opinion</u>

In contrast to Dr. Barrett's opinion, Dr. Wandling's Expert Report provides helpful insight into the cause of the accident.  Dr. Wandling's conclusion is that Mr. Sprouse used improper lift points on the Truck, which "produced unequal weight distribution and reduced the stability of the pickup," and that "movement of the front passenger lift arm was not the cause of this accident."  (Wandling Rep. 17.)  Dr. Wandling found, based on his measurements, that the truck slid forward on the lift

---

[8] Dr. Barrett's Report also mentions improper installation as a cause of the accident, which Plaintiff originally alleged against ATD.  This claim was dismissed by this Court in a 12(b)(6) Motion, but Plaintiff fails to account for improper installation as another possible cause of the accident.

pad for over twenty inches before falling over the front lift arms.  (Id.)  He concludes that the movement of the arm was a result of the Truck falling off the Lift, not the cause of the accident.  (Id.)  Dr. Wandling's report adds that there were no manufacturing defects and the arm locking assembly was working properly when Mr. Sprouse raised the Lift.  (Id. 18.)  The explanation for the front passenger side arm sliding back, as Dr. Wandling suggests, is because the horizontal force from the Truck falling forward pushed it back.  (Id.)

Dr. Wandling's Report is supported by evidence collected from the scene and examinations done of the Lift.  First, the front lift pads were found elevated with a six inch lift pad adapter, while the rear lift pads were found elevated with a nine inch lift pad adapter, indicating that the vehicle was tilted forward while on the Lift.  (Id. 12.)  Second, the lift arms on the passenger side were approximately two inches higher than those on the driver's side, indicating that the vehicle was also tilted toward the driver's side.  (Id.)  Dr. Wandling calculated that the vehicle was tilted at an angle of four to seven degrees toward the front driver's side lift point at the time of the accident.  (Id. Attach. E.)

Dr. Wandling also spends a significant portion of his Report documenting the marks left by the lift arm on the underside of the Truck.  He notes that the lift points used by Mr. Sprouse were improper and caused the frame to slide off the lift pad.  (Id. 13; Figs. 9–13.)  Specifically, he concludes that the front driver's side lift pad was on the edge of the frame, which caused the Truck to slide, and eventually fall.  (Id.; Fig. 9.)  In sum, the Truck slid forward approximately twenty-three inches, according to

Dr. Wandling's measurements. (Id.) Dr. Wandling measured the appropriate lift points for the Truck and its center of gravity and found that Mr. Sprouse placed the lift arms 9.6 inches from the center of gravity, when they should have been placed 25.5 inches from the center of gravity. (Id. 14; Figs. 14–16; Attachs. C, D.)

Dr. Wandling's Report also discusses evidence which tends to support the idea that Mr. Sprouse misused the Lift. The Lift contained a mechanical safety on each tower that when the Lift was raised, the level on the safety and the down button on the power source both had to be engaged to lower the Lift. (Id. 4.) Mr. Sprouse overrode that feature by holding it in the "disengaged position with a bungee cord." (Id. 11; Fig. 7.) Additionally, Dr. Wandling documented wear on the gear teeth of the arm locking assembly connected to the tower and cracks and damage to the lifting pads, which were easily identifiable upon inspection. (Id. 16; see Barrett Dep. 135:16–136:14 ("If Mr. Sprouse had done what he was supposed to do under this standard, and if the condition you claim was a result of the manufacturing defect were present on his Lift, he'd have noticed it, wouldn't he? He probably would have, yes.").) Both of these factors weigh heavily in favor of finding that the accident was caused by something other than a manufacturing defect, which Plaintiff's expert never addresses in his Report.

Because Plaintiff fails to present evidence that the Lift was defective when it left Snap-On Defendants' control and the alleged defect caused the accident with "reasonable certainty," beyond that of the unsupported and speculative opinions of Dr. Barrett, Plaintiff fails to support a claim of manufacturing defect. Therefore, Snap-

On Defendants' Motion for Summary Judgment on Count One will be GRANTED.

B. <u>Failure to Warn</u>

Virginia law requires that if a manufacturer "(1) knows, or should know, that its product is likely to be dangerous for its intended use; (2) does not have any reason to believe that intended users of the product will recognize that danger; and (3) fails to use reasonable care to warn those people of that danger, the manufacturer is liable for failure to warn." <u>Hall</u>, 2007 WL 2965054, at *4–5.  However, there is no duty to warn if the person using the product should be, or should have been, aware of the danger.  <u>Id.</u>; <u>Spangler v. Kranco, Inc.</u>, 481 F.2d 373, 375 (4th Cir. 1973); <u>see</u> <u>Featherall v. Firestone Tire & Rubber Co.</u>, 252 S.E.2d 358, 366 (Va. 1995) (suggesting that a duty to warn exists only if a manufacturer has superior knowledge of the danger posed by its product).  The Supreme Court of Virginia, in <u>Featherall</u>, approved Restatement 388, which imposes a similar duty to warn on both manufacturers and sellers. <u>Dameron v. Fort Worth Steel & Mach. Corp.</u>, 1985 WL 306781, at *8 (Va. Cir. Ct. 1985) (Richmond); <u>see e.g.</u>, <u>Logan</u>, 219 S.E.2d at 428 (stating that the duty to warn can be established in both the seller and the manufacturer).

Plaintiff's expert, Patrick McGuire, found no major faults with the warnings given in the Lift's Operating Manual, or those affixed to the Lift.  (McGuire Rep. 5.) However McGuire did conclude that there was an "<u>absence</u> of warnings which could have prevented this accident."  (<u>Id.</u> (emphasis added).)  McGuire found that if the arms of the Lift could fail because of the operation of the gear mechanisms, a

18

warning needed to be placed in the Operating Manual and on each swing arm,
warning that the user should "inspect and confirm the integrity of the restraint
system on a frequent, e.g., daily basis." (Id. 6.)[9]   McGuire also found that there
should have been explicit requirements stated in the Operations Manual regarding
the foot pounds of torque to be used in bolt fastening. (Id. 7.)  McGuire concluded
that Mr. Sprouse was not a risk-taker, and did not have tendencies which would
indicate that he would ignore warnings and would use the Lift recklessly. (McGuire
Supplemental Rep. 1–2; McGuire Dep. 78:8–81:24.)  From this evidence, this expert
concludes that had these warnings been present, "more likely than not, this accident
could have been prevented." (McGuire Rep. 7.)

However, in his deposition testimony, McGuire admits that his conclusions
were based on the conclusions of Dr. Barrett, in that, "If it could be shown
adequately there's no relationship between whether or not these supporting arms
are able to freely float back and forth and no relationship to whether or not the gears
engage or don't engage, then my recommendations for warnings are moot."
(McGuire Dep. 118:2–13.)  He continues, "So the linchpin in terms of my testimony
has to be that there's a causal connection." (Id. 118:15–22.)  Therefore, by Plaintiff's
own admission, if evidence of a manufacturing defect cannot be shown to have
caused the accident, McGuire's conclusions are irrelevant and cannot support a

---

[9] McGuire suggests a warning similar to, "DANGER Unsecured Support Arms
Can Cause Collapse.  Unsecured support arms can pivot and cause the collapse of
the vehicle load causing severe injury or death.  Inspect each support arm lock daily
to make certain gear teeth fully engage on lifting and that support arms are held
firmly in place.  Periodically inspect all bolts for tightness." (McGuire Rep. 6.)

19

failure to warn claim.  Because Plaintiff is unable to demonstrate a manufacturing

defect was present on the Lift, there is no evidence supporting a finding of a failure

to warn by any Defendant.  Because there is no issue of fact as to the failure to warn

claim, Defendants' Motion for Summary Judgment will be GRANTED as to Count

Two.

C.  Breach of Warranty of Merchantability

Plaintiff's Complaint alleges that Defendants impliedly warranted that the Lift

would be of merchantable quality and fit for its intended and ordinary use, but

because of the manufacturing defect and inadequate warnings, this duty was

breached.

In a contract for the sale of goods, "a warranty that the goods shall be

merchantable shall be implied . . . if the seller is a merchant with respect to goods of

that kind."  Va. Code § 8.2-314(1) (2009).  In this case, there are two parties who

would be held to this warranty, Snap-On Defendants and ATD.  See Bly, 713 F. 2d at

1044–45 (stating that sellers and manufacturers may be held liable for a breach of

implied warranty of merchantability).  To prevail under this claim, the same rule

governs contract, as governs the above negligence analysis; Plaintiff must show the

product was "unreasonably dangerous either for the use to which it would ordinarily

be put or for some other reasonably foreseeable use, and (2) that the unreasonably

dangerous condition existed when [it] left the manufacturer's hands."  Jeld-Wen, Inc.

v. Gamble, 501 S.E.2d 393, 396 (Va. 1998).

Given the analysis above, Plaintiff fails to provide any facts supporting a

finding of a manufacturing defect or a breach of the duty to warn.  Thus, Plaintiff has also failed to provide evidence supporting a breach of the implied warranty of merchantability.  For this reason, Defendants' Motion will be GRANTED.

D.  ATD's Motion for Summary Judgment

ATD filed their Motion for Summary Judgment alleging that Plaintiff has failed to produce evidence that as a supplier, ATD placed an allegedly defective product in the stream of commerce.  ATD states that if Plaintiff fails to state as a matter of law that the Lift was defective or caused Mr. Sprouse's injuries, then ATD's Motion should be granted.  The Court agrees.

As is discussed above, all of the claims will be dismissed against Snap-On Defendants and because the only liability possible for ATD would be derivative of the liability imposed on Snap-On Defendants, ATD's Motion for Summary Judgment will be GRANTED.

IV.  CONCLUSION

For the aforementioned reasons, Defendants' Motions for Summary Judgment will be GRANTED, thereby dismissing all counts in the Amended Complaint. Defendants have also filed Motions to Exclude Plaintiff's Experts, Dr. Barrett and McGuire, however, these Motions will be DISMISSED AS MOOT.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate Order shall issue.

_____/s/_____

James R. Spencer
Chief United States District Judge

ENTERED this 15th day of May 2009